UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
PATRICIA IULO,

                                 Plaintiff,

             -against-

COMMISSIONER of the SOCIAL SECURITY
ADMINISTRATION,

                             Defendant.
-----------------------------------------------------------------X

For Online Publication Only

**MEMORANDUM & ORDER**
16-CV-5366 (JMA)

FILED
CLERK

3/29/2018 4:59 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**APPEARANCES:**

    Aba Heiman
    Fusco, Brandenstein & Rada, PC
    180 Froehlich Farm Boulevard
    Woodbury, NY 11797
    *Attorney for Plaintiff*

    Peter W. Jewett
    United States Attorney's Office
    Eastern District Of New York
    271 Cadman Plaza East, 7th Floor
    Brooklyn, NY 11201
    *Attorney for Defendant*

**AZRACK, United States District Judge:**

    Plaintiff Patricia Iulo brings this action seeking review of the final determination by the Commissioner of Social Security, reached after a hearing before an administrative law judge ("ALJ"), denying plaintiff disability insurance benefits under the Social Security Act. The case is before the Court on the parties' cross-motions for judgment on the pleadings. Because the ALJ's decision was supported by substantial evidence and applied the proper legal standards, plaintiff's motion for judgment on the pleadings is DENIED, and defendant's cross-motion is GRANTED.

## I.    BACKGROUND

**A.  Procedural History**

On January 24, 2012, plaintiff filed for disability insurance benefits with the Social Security Administration ("SSA"), alleging that she became disabled on May 3, 2007. (Administrative Transcript ("Tr.") 14, 86.)  On July 19, 2012, the SSA denied plaintiff's disability application.  (Id. at 110.)  On July 30, 2012, plaintiff filed a written request for a hearing.  (Id.)  On April 11, 2013, plaintiff appeared at a hearing before ALJ Andrew Weiss.  (Id. at 61-85.)  By decision dated April 24, 2013, the ALJ found that plaintiff was not disabled. (Id. at 87-98.) On August 27, 2014, the Appeals Council granted plaintiff's request for review and remanded the decision to the ALJ for further consideration.  (Tr. 104-05.)  A new hearing was held on March 4, 2015.  (Id. at 30-60.)   On March 18, 2015, the ALJ found that plaintiff was not disabled.  (Id. at 14-24.)  Plaintiff again requested review by the Appeals Council, but the Council denied plaintiff's request on August 29, 2016.  (Id. at 1-5.)

**B.  Plaintiff's Background and Testimony**

Plaintiff was born in August 1954 and was fifty years old on the date of the 2015 hearing before the ALJ.  (Id. at 33.)  Plaintiff attended special education programs in elementary and middle school and was "mainstreamed" in high school.  (Tr. 34, 36-37.)  Plaintiff lives at home with her parents.  (Id. at 36.)  She is able to shower and dress on her own and makes her own lunch.  (Id. at 80.)  Her mother sometimes has to remind her to brush her teeth or her hair, but she can manage her own personal care for the most part.  (Id.)  Plaintiff's mother prepares dinner for her.  (Id. at 271.)  Plaintiff does chores around the house such as dusting, washing and ironing her clothes, drying pots and pans, and emptying the dishwasher.  (Tr. 271.)  Plaintiff drives herself to work every day, which is two miles from her home.  (Id. at 78, 83.)

Plaintiff worked as a data entry clerk for a freight billing company from 1991 to 2007 where she earned about $15,000 per year on average over the course of those 16 years. (Id. at 37-38, 77, 234.) She was terminated from that position in May 2007 due to downsizing. (Id. at 52.) When plaintiff first started her data entry job with the freight billing company, she talked to a job coach every day. (Id. at 76-77.) Later, she saw the coach only "every so often." (Tr. 77.) Plaintiff had a supervisor who assisted her when necessary, (id. at 38-39), but plaintiff estimated that she only asked for help reading handwritten bills approximately 1-2 times per day. (Id. at 58-59.) If there were mistakes in her work, they were not sent back to her, but corrected by another employee. (Id. at 43.)

At the time of the 2015 hearing, plaintiff was working part-time for the Town of Oyster Bay, occasionally checking the restrooms in a town park to determine if they required cleaning. (Id. at 34-35.) She did not clean the bathrooms herself; she only reported to someone that they required cleaning. She also responded to some telephone calls concerning basic questions such as "is the park open today?," but "most of the time" she would transfer the calls to "somebody higher up." (Tr. 34-35.) She had also done part-time work for Oyster Bay issuing parking and shell-fishing permits. (Id. at 65.) Plaintiff testified that she would like—and has requested—to work for Oyster Bay full-time, but that the town had not offered her a full-time position. (Id. at 35-36.)

Plaintiff's father also testified at the 2015 hearing, confirming that plaintiff worked with a job coach for her first five weeks at the freight billing company and that from time to time plaintiff would make errors in her work, which had to be corrected. (Id. at 43.) He testified that plaintiff had worked in the clerk's office at the Town of Oyster Bay on a part-time basis for three years. (Id. at 45.) Plaintiff's father also testified that plaintiff does her own laundry and is able to cook for herself, but is often supervised by her mother. (Tr. 48.)

3

**C.  Medical Evidence From Providers Concerning Plaintiff's Limitations**

At the age of six, plaintiff was diagnosed with delayed speech and developmental aphasia (a difficulty finding words).  (Tr. 373.)

**1.  Dr. Zanger**

Dr. Zanger, a psychologist, examined plaintiff in 1991 when she was 26 years old and found her Full Scale I.Q. to be 79, "which places her in the borderline range of intelligence" and her verbal I.Q. to be 76.  (Tr. 385.)  Dr. Zanger concluded that plaintiff has "an organic mental disorder and she shows both psychological and cognitive difficulties associated with brain dysfunction."  (Id.)

In March 2013, Dr. Zanger performed another psychological evaluation.  (Id. at 505-08.)  Plaintiff was cooperative and pleasant, and was not anxious or depressed.  (Id. at 506.)  She answered all questions in a very rigid and simplified manner.  (Id.)  Dr. Zanger diagnosed a pervasive developmental disorder.  (Id. at 507.)  Dr. Zanger concluded that she had a very restricted repertoire of activities, and showed deficits in social interaction, the ability to handle money, and to adapt to any work situation that is different from what she experienced before.  (Tr. 507.)  Dr. Zanger diagnosed plaintiff with cerebral palsy, and concluded that plaintiff was of borderline intellectual ability.  (Id.)  Dr. Zanger opined that plaintiff could not be expected to do any gainful competitive employment, and that her limitations interfered with her ability to function independently, appropriately, and effectively on a sustained basis.  (Id. at 508.)

**2.  Dr. Elliot**

Dr. Elliot, also a psychologist, examined plaintiff in 2007 at the age of 43 and found a Full Scale I.Q. of 84 and a Verbal IQ of 76.  (Id. at 390-93.)  Dr. Elliot noted that plaintiff "learns new

tasks rapidly" and is "very motivated to do her best," but that she "has many of the residual signs of a developmentally delayed language system associated with childhood aphasia." (Id. at 392.)

### 3. Dr. Appenzeller

In May 2011, Plaintiff was examined by psychologist Dr. Appenzeller, and speech pathologist Nancy Weiss. On examination, Plaintiff was fairly quiet, but pleasant and cooperative, and responded to all questions posed to her. (Id. at 399.) She spoke in full sentences, but not always fluently. (Tr. 399.) Frequently, she had difficulty finding the correct words she wanted to use. (Id. at 399.) Plaintiff sometimes needed additional time to process auditorially presented information and had difficulty with word retrieval. (Id. at 404.) However, plaintiff demonstrated adequate understanding and appropriate use of grammatical morphemes, temporal processing, and basic sequencing. (Id.) She used various sentences, and her basic syntactic, lexical, and grammatical development appeared to be within functional limits. (Id.) She responded to basic personal questions appropriately. (Tr. 404.) Dr. Appenzeller noted that plaintiff's speech intelligibility was fair to good, and her articulation skills were within functional limits. (Id. at 405.) She had mild difficulty with some multisyllabic words. (Id.)

Dr. Appenzeller opined that plaintiff's scores met the criteria for an autism spectrum disorder, but that these scores were "more a function of her lower cognitive and verbal abilities, rather than true autism." (Id. at 427.) Dr. Appenzeller diagnosed "pervasive development disorder–not otherwise specified." (Id.) Dr. Appenzeller further noted that plaintiff might meet the diagnostic criteria for cerebral palsy, which is an "umbrella term" for disorders caused by damage to the motor control centers of the developing brain. (Tr. 408.)

### 4. Dr. Entin

In August 2011, plaintiff saw Dr. Entin, a neurologist.  (Id. at 454-55.)  Dr. Entin reported that plaintiff was alert and fully oriented, and that her language function was dysarthric, with mild dysnomia and mild dysphasia.  (Id. at 454.)  She read slowly with some difficulty pronouncing polysyllabic words.  (Id.)  Dr. Entin's impression was probable cerebral palsy.  (Id. at 455.)  Dr. Entin ordered magnetic resonance imaging (MRI) and an electroencephalogram (EEG).  (Tr. 455.) Plaintiff saw Dr. Entin for a follow up evaluation in September 2011 and Dr. Entin noted a normal MRI, and EEG revealed bi-frontal and left temporal slowing.  (Id. at 439, 464, 467.)  On examination, Plaintiff had normal speech.  (Id. at 439.)  Dr. Entin diagnosed cerebral palsy with learning disabilities and dysphasia.  (Id. at 440.)

### 5. Dr. Pollack

In March 2012, Dr. Pollack examined plaintiff, for a consultative neurologic examination. Dr. Pollack noted that plaintiff was diagnosed with cerebral palsy in 2011.  (Id. at 468.)  Plaintiff stated that the only effect of her cerebral palsy was her speech, which sometimes caused her to pronounce words slowly.  (Id.)  Plaintiff reported being able to cook, clean, do laundry, shop, shower, dress herself, watch television, bowl, go out to dinner, and socialize with friends.  (Tr. 469.)  Plaintiff spoke very slowly with hesitancy.  (Id. at 469.)  Dr. Pollack reported that plaintiff's mental status and her physical examination were normal.  (Id. at 470.)  Dr. Pollack diagnosed plaintiff with, among other conditions, dysphasia, pervasive developmental disorder, and cerebral palsy with speech impairment.  (Id. at 471.)  Dr. Pollack assessed mild restriction in speech and also recommended a cognitive evaluation.  (Id.)

### 6. Dr. Miller

In June 2012, Dr. Miller examined plaintiff for a consultative psychiatric evaluation.  Dr. Miller reported that plaintiff had deficits in receptive language that made it hard for her to understand complex utterances, and she made occasional word-finding mistakes.  (Id. at 475.) Mental status examination revealed an intelligibility-articulatory problem, but her expressive and receptive language was adequate.  (Tr. 475.)  Her thought processes were normal, her affect was restricted, and her mood was neutral.  (Id.)  Plaintiff was fully oriented, and her attention and concentration were intact.  (Id.)  Memory skills were also intact.  (Id. at 476.)  Cognitive functioning appeared to be below average.  (Id.)  Dr. Miller assessed that plaintiff would have some trouble relating adequately with others, could follow and understand simple directions and instructions, and could perform simple tasks independently, make appropriate decisions, and deal appropriately with stress.  (Tr. 476.)  Dr. Miller determined that plaintiff's psychiatric problems did not appear to be significant enough to interfere with her ability to function on a daily basis. (Id.)

### 7. Dr. Kennedy-Walsh

In July 2012, Dr. Kennedy-Walsh, a State agency psychiatric consultant, reviewed plaintiff's medical records, and completed a psychiatric review technique form.  (Id. at 478-91.) Dr. Kennedy-Walsh opined that plaintiff's mental disorders did not meet the criteria of Sections 12.05 (intellectual disability) or 12.10 (autism and other pervasive developmental disorders), of the Listing of Impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"). (Id. at 478, 482, 487.)  With respect to the "B" criteria of listing 12.10 and the "D" criteria of listing 12.05, Dr. Kennedy-Walsh assessed mild restrictions in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in maintaining concentration,

persistence, or pace.  (Id. at 488.)  Plaintiff had no repeated episodes of decompensation.  (Tr. 488.)

Dr. Kennedy-Walsh also assessed plaintiff's mental residual functional capacity.  (Id. at 492-95.)  With regard to understanding and memory, he opined that plaintiff was moderately limited in her abilities to remember locations and work-like procedures, and to understand and remember detailed instructions.  (Id. at 492.)  Dr. Kennedy-Walsh concluded that plaintiff was not significantly limited in her ability to understand and remember very short and simple instructions. (Id.)

With respect to sustained concentration and persistence, Dr. Kennedy-Walsh determined that plaintiff was not significantly limited in her abilities to carry out very short and simple instructions, or in the ability to make simple work related decisions.  (Id. at 492-93.)  He concluded that she was moderately limited in her abilities to:

- carry out detailed instructions;

- maintain attention and concentration for extended periods;

- perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision;

- work in coordination or proximity to others without being distracted;

- complete a normal work day or work week without interruptions from psychologically based symptoms;

- and perform at a reasonable pace without an unreasonable number and length of rest periods.

(Tr. 492-93.)

## D.  Vocational Evidence

Amy Peiser Leopold, a vocational expert ("VE"), testified at the March 2015 hearing.  The VE testified that plaintiff's job at the freight company would classify as substantial gainful activity

("SGA"). (Tr. 50.) The Dictionary of Occupational Titles classifies that job as data entry clerk (code 203.582-054), which is sedentary and semi-skilled. (Id.) As plaintiff described it, it was performed at an unskilled level. (Id.) The VE testified that plaintiff's work at the freight company was not a sheltered workshop, as she did not have an on-site job coach all the time. (Id. at 55.) In fact, the VE testified that plaintiff "was doing it on her own unless she couldn't read the handwriting and needed help" and that plaintiff didn't need "a whole lot of supervision." (Id.) The VE also testified that "it does sound like they made some accommodations for her to be able to do the work for so many years," but that "it sounds like once the task was learned of this position she was able to do it for—you know, for many years." (Tr. 54-55.) The VE also stated, "it sounds to me that she kept up with the production and the performance of the work." (Id. at 55.)

In September 2007, plaintiff underwent a vocational evaluation at the Rehabilitation Institute. Testing revealed ninth grade level math, and eleventh grade problem solving skills. (Id. at 318.) Plaintiff made errors in complex proofreading, but was able to do basic math without a calculator. (Id.) In a situational assessment, plaintiff did not do as well, and achieved 90% in filing after repeating the activity numerous times. (Id.) Visual comparisons, referencing, and coding were satisfactory. (Tr. 318.) She typed 30 words per minute. (Id.) Accuracy with a calculator was only 70%. (Id.) She was unable to process multi-step written materials, and needed concrete step-by-step instruction. (Id.) Staff at the Rehabilitation Institute thought she would be unable to work competitively without one on one support, but plaintiff's mother thought plaintiff could do some sort of data entry job. (Id.) Considering a number of factors, including appearance, work habits, physical abilities, work tolerance, relationships/personality, attitudes, and learning ability/comprehension, plaintiff's skills and behavior were noted to be appropriate for competitive employment with training. (Tr. 320-21.)

In February and March of 2015, plaintiff underwent a vocational evaluation at Abilities, Inc. for the purposes of determining whether she could pursue employment as a data entry clerk for the federal Schedule A hiring program.  The counselors at Abilities, Inc. noted that plaintiff made appropriate eye contact, but at times, she was tangential in speaking, and her quality of speech was occasionally unintelligible due to her raspy voice.  (Id. at 535.)  Plaintiff followed all directions, and demonstrated an ability to follow multi-modal directions including visual demonstration, and verbal direction.  (Id. at 536.)  She was able to complete tasks with minimal supervision and was able to appropriately express any concerns, and sought assistance when needed.  (Id.)  During this evaluation, plaintiff tested at the sixth grade level in vocabulary, language mechanics, and spelling, and the seventh grade level in mathematics.  (Id.)  Plaintiff completed all tests at an above average pace and could type 34 to 37 words per minute, an intermediate level.  (Tr. 536.)  Areas of limitation included testing in the third grade level for language, and the fifth grade level in mathematics computation and reading.  (Id. at 537.)  Plaintiff performed in the below average range for clerical tasks.  (Id.)  The counselors noted in their report that Schedule A clerical positions "require[] a certain level of data entry skills, computer literacy, and knowledge of computer software programs."  (Id. at 537.)  The counselors concluded that plaintiff's abilities in those areas did not meet the requirements for clerical workers in the current job market, and encouraged plaintiff to explore lateral or promotional opportunities with her current employer.  (Id. at 537-38.)

**E.  The ALJ's Decision**

In a decision dated March 18, 2015, the ALJ found that plaintiff was not disabled as defined by the Social Security Act.  The ALJ applied the five-step evaluation process, described below, pursuant to 20 C.F.R. § 404.1520.  (Tr. 24.)

At the first step of the analysis, the ALJ concluded that plaintiff had not engaged in SGA since May 3, 2007, the alleged onset date. (Id. at 16.) Although plaintiff had worked during various times between 2007 and the date of the ALJ's decision, the ALJ found that this work did not rise to the level of SGA. (Id.) At the second step, the ALJ found that plaintiff had two severe impairments: a pervasive developmental disorder and cerebral palsy. (Id. at 17.) At the third step, the ALJ concluded that plaintiff's impairments, alone or in combination, did not meet or equal any of the listed impairments that would automatically render plaintiff disabled. (Id. at 17-18.) Specifically, the ALJ considered listings 11.07C for cerebral palsy, 12.02 for organic mental disorders, and 12.05 for intellectual disability. (Tr. 17-18.)

The ALJ then addressed step four, turning first to plaintiff's Residual Functioning Capacity ("RFC"). An RFC determination identifies what work a claimant can still perform, despite her limitations. See 20 C.F.R. § 404.1545. The ALJ found that plaintiff had the RFC to perform sedentary work, except she could not perform complex tasks independently, and could not tolerate high degrees of stress, which was defined as an inability to maintain production quotas, an inability to make complex work related decisions, and an inability to tolerate significant changes in her work environment. (Id. at 18.) Next, at step four, the ALJ found that plaintiff was capable of returning to her past relevant work as a data entry clerk. (Id. at 22-23.) The ALJ determined that plaintiff's prior employment as a data entry clerk was not performed in a sheltered workshop because she only had a job coach for a limited time at the beginning of her employment and thereafter was expected to maintain an adequate level of production. (Id. at 23.) The ALJ also noted that plaintiff's earnings were well over the levels necessary to qualify as SGA and that she did not have any other special arrangements for her work. (Id. at 23) The ALJ determined that because plaintiff could perform her past relevant work, she was not disabled. (Id. at 23-24.)

Because the ALJ determined that plaintiff could perform her past relevant work, he did not proceed to step-five to determine if plaintiff was able to engage in other kinds of work.

In considering plaintiff's limitations, the ALJ gave great weight to the findings of Drs. Pollack, Miller, and Kennedy-Walsh as he determined that they were well supported by the testimony and statements regarding plaintiff's activities of daily living and her ability to perform her then-current position with the Town of Oyster Bay. (Tr. 21.) The ALJ did not give "great weight" to the opinion of Dr. Zanger because he found that it was contradicted by that testimony. (Id. at 21-22.)

## II.    DISCUSSION

### A.  Legal Standard

#### 1.  Entitlement to Disability Benefits

Under the Social Security Act, disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is disabled when his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." Id. § 423(d)(2)(A).

The Commissioner's regulations set out a five-step sequential process to determine whether an individual is disabled. 20 C.F.R. § 404.1520. The Commissioner must determine: (1) whether the claimant is working; (2) whether the claimant has a 'severe impairment'; (3) whether the impairment is one listed in Appendix 1 of the regulations that conclusively requires a

determination of disability; (4) whether the claimant is capable of continuing in his prior type of work; and (5) whether there is another type of work the claimant can do. Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008). The claimant has the burden of proving the requirements of the first four steps. Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). If the claimant meets his burden, the burden of proof then shifts to the Commissioner to prove that there is other "work in the national economy that the claimant can do." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

### 2. Review of the ALJ Decision

In reviewing a denial of disability benefits by the SSA, it is not the function of the district court to review the record de novo, but instead to determine whether the ALJ's conclusions "are supported by substantial evidence in the record as a whole, or are based on an erroneous legal standard." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (quoting Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Perez, 77 F.3d at 41 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)). Thus, the Court will not look at the evidence supporting the ALJ's decision in "isolation, but will view it in light of other evidence that detracts from it." State of New York ex rel. Bodnar v. Sec. of Health and Human Servs., 903 F.2d 122, 126 (2d Cir. 1990). An ALJ's decision is sufficient if it is supported by "adequate findings . . . having rational probative force." Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

Generally, when a reviewing court is "'unable to fathom the ALJ's rationale in relation to evidence in the record, especially where credibility determinations and inference drawing is required of the ALJ,' [the reviewing court] will not 'hesitate to remand for further findings or a clearer explanation for the decision.'"  Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam) (quoting Berry v. Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)).  In some circumstances, however, remand may not be necessary even if an ALJ's decision does not explicitly address certain pieces of evidence or factors set out in the SSA's regulations.  For example, remand is not required where the ALJ's decision is specific enough to allow for meaningful review by courts such that the decision and record allow a reviewing court to glean the rationale of the ALJ's decision, and the decision indicates that the ALJ considered all relevant evidence.  See, e.g., Cichocki, 729 F.3d at 177 (holding that an ALJ's failure to conduct a complete function-by-function analysis as part of an RFC determination does not require remand where the ALJ's analysis "affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence"); Cichocki v. Astrue, 534 F. App'x 71, 76 (2d Cir. 2013) (holding that the ALJ's failure to address all of the credibility factors in 20 C.F.R. § 416.929(c)(3) did not require remand because the court could glean the rationale of the ALJ's decision); Mongeur, 722 F.2d at 1040 ("When . . . the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.").

## B.  Plaintiff's Arguments

First, plaintiff asserts that she is disabled *per se* because her impairments, when considered in combination, equal the severity contemplated by the listings in Appendix 1.  (Pl.'s Br. 14-15.)  In

the alternative, she argues that the case should be remanded for further consideration on medical equivalence. (<u>Id.</u> at 15.) Next, plaintiff claims that the ALJ erred in determining that her past relevant work as a data entry clerk was SGA. (<u>Id.</u> at 12-13.) Plaintiff argues that she received certain accommodations in that position and therefore the presumption that her earnings were substantial gainful activity is rebutted. (<u>Id.</u> at 13.) Lastly, plaintiff argues that the ALJ committed legal error when he afforded great weight to the opinions of three consultative doctors, but did not give great weight to the opinion of plaintiff's treating doctor. (<u>Id.</u> at 15-16.)

## C. Application

### 1. Medical Equivalency

Plaintiff contends that the ALJ erred by concluding that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Appendix 1. While plaintiff acknowledges that the ALJ's decision explored whether her combined impairments equaled the severity contemplated by the listings, she claims that SSA regulations require that a determination of medical equivalency when considering combined impairments be made by a medical or psychological consultant designated by the Commissioner. (Pl.'s Br. at 15.) In support of this argument, plaintiff notes that no medical or psychiatric consultant testified at the hearings and cites to 20 C.F.R. § 404.1526(e), which sets out who is responsible for determining medical equivalence. However, plaintiff misreads § 404.1526(e), which states that in cases where "the State agency or other designee of the Commissioner makes the initial or reconsideration disability determination, a State agency medical or psychological consultant or other designee of the Commissioner . . . has the overall responsibility for determining medical equivalence." 20 C.F.R. § 404.1526(e)(1). However, in cases such as this one, "at the administrative law judge or Appeals Council level, the responsibility

for deciding medical equivalence rests with the administrative law judge or Appeals Council." 20 C.F.R. § 404.1526(e)(3). Additionally, the regulation makes no mention of any requirement that a medical or psychiatric consultant testify at the hearing, even in cases where the consultant is responsible for making a determination on medical equivalence.

To the extent that plaintiff asserts that the ALJ's finding at step three was not supported by substantial evidence, the Court rejects that argument. As discussed further below, there was ample evidence in the record supporting the ALJ's findings. For example, with respect to listing 11.07C, there were reports from doctors that plaintiff had only mild or moderate limitations with respect to her speech, (see Tr. 436), and not "significant interference in communication due to speech." 20 C.F.R. Part 404, Subpart P, App. 1, § 11.07. Similarly, the ALJ's rationale for concluding that plaintiff did not meet the requirements for listing 12.05D was supported by the medical record, which indicated that she neither had the requisite I.Q. scores nor the required marked limitations as described by the listing. See 20 C.F.R. Part 404, Subpart P, App. 1, § 12.05.

Accordingly, the ALJ's determination that plaintiff's impairments were not medically equivalent to any of the listings in Appendix was based on substantial evidence and correct legal principles.

### 2. Substantial Gainful Activity

Plaintiff contends that her work as a data entry clerk did not rise to the level of SGA. SSA regulations define SGA as "work activity that involves doing significant physical or mental activities . . . for pay or profit." 20 C.F.R. § 404.1572. "In determining whether work constitutes SGA, the 'primary consideration' is the claimant's earnings." Figueroa-Plumey v. Astrue, 764 F. Supp. 2d 646, 650 (S.D.N.Y. 2011) (quoting 20 C.F.R. § 404.1574(a)(1)). Where a claimant's monthly earnings average more than the amounts listed in the SSA's earnings tables for the

relevant year, there is a rebuttable presumption that the claimant has engaged in SGA.  If the claimant performed the work under special conditions, that work may not qualify as SGA.  20 C.F.R. § 404.1573(c).  "However, work done under special conditions may show that [the claimant has] the necessary skills and ability to work at the substantial gainful activity level."  Id.  Plaintiff bears the burden of establishing that her past relevant work did not constitute SGA.  See 20 C.F.R. § 404.1512(a).

Substantial evidence supports the ALJ's determination that plaintiff's past employment as a data entry clerk constituted SGA and that she did not work under special conditions.  The record establishes that plaintiff earned $18,314.44 in 2004, $17,122.73 in 2005, and $20,964.18 in 2006, well above the threshold levels for those years.  (Tr. 23.)  Plaintiff and her father testified that she only had a job coach for her first few weeks and after that time, primarily worked independently with minimal supervision.  (Id. at 38-39, 58-59.)  Therefore, the ALJ's conclusion that plaintiff was not working in a sheltered workshop as defined by the regulations was supported by substantial evidence.  Plaintiff also failed to establish that any of the six considerations described in § 404.1573(c) were met.

That section sets out of the following examples of special conditions to be considered when determining whether the claimant has the ability to work at the substantial gainful activity level:

> (1) You required and received special assistance from other employees in performing your work;
>
> (2) You were allowed to work irregular hours or take frequent rest periods;
>
> (3) You were provided with special equipment or were assigned work especially suited to your impairment;
>
> (4) You were able to work only because of specially arranged circumstances, for example, other persons helped you prepare for or get to and from your work;

> (5) You were permitted to work at a lower standard of productivity
> or efficiency than other employees; or
>
> (6) You were given the opportunity to work despite your impairment
> because of family relationship, past association with your employer,
> or your employer's concern for your welfare.

20 C.F.R. § 404.1573(c).

While plaintiff's father testified that she would make errors "from time to time" which were then corrected by another employee, plaintiff did not identify any specific accommodations made for her. (Tr. 43.) Plaintiff testified that she held this position for 16 years, that she was able to keep up with the pace of the work and that she was let go from that position due to downsizing, not her disability. (Id. at 52.) Furthermore, the VE confirmed that "she kept up with the production and the performance of the work." (Id. at 55.) Accordingly, the ALJ's determination that plaintiff did not perform her work under special conditions is supported by substantial evidence in the record.

### 3. ALJ's Weighing of the Medical Evidence

Plaintiff also claims that the ALJ erred in weighing the medical evidence. (Pl.'s Br. 18.) Plaintiff argues that the ALJ erred because he: (1) failed to state the weight he gave to the opinions of Drs. Brower, Klein, Elliot, Appenzeller, and Entin; and (2) he improperly credited the opinions of Drs. Pollack, Miller and Kennedy-Walsh over the opinion of plaintiff's treating physician, Dr. Entin, and Dr. Zanger who evaluated plaintiff on two separate occasions.

A treating physician is defined as a claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant." 20 C.F.R. §

404.1502.[1]  A treating physician's opinion receives "controlling weight" if the opinion regarding the nature and severity of an individual's impairments is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004).

However, a treating physician's opinion is not always controlling.  "For example, a legal conclusion that the claimant is 'disabled' or 'unable to work' is not controlling, because such opinions are reserved for the Commissioner."  Ogirri v. Berryhill, No. 16-CV-9143, 2018 WL 1115221, at *8 (S.D.N.Y. Feb. 28, 2018) (citing Guzman v. Astrue, No. 09-CV-3928, 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011)) (internal quotation marks omitted).  Additionally, a treating physician's opinion will not be given controlling weight when it is "not consistent with other substantial evidence in the record, such as the opinions of other medical experts."  Halloran, 362 F.3d at 32.  In determining whether a treating physician's opinion should be given controlling weight, the ALJ must consider a number of factors set out by the SSA regulations:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship;
>
> (ii) the evidence in support of the treating physician's opinion;
>
> (iii) the consistency of the opinion with the record as a whole;
>
> (iv) whether the opinion is from a specialist; and
>
> (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

---

[1]  In 2017, new SSA regulations came into effect.  The newest regulations apply only to claims filed with the SSA on or after March 27, 2017.  Accordingly, because plaintiff's claim was filed in 2012, the Court applies the regulations that were in effect at the time of filing.  See, e.g., Ogirri v. Berryhill., No. 16-CV-9143, 2018 WL 1115221, at *6 n.7 (S.D.N.Y. Feb. 28, 2018) (noting 2017 amendments to regulations but reviewing ALJ's decision under prior versions); Rousey v. Comm'r of Social Sec., No. 16–CV–9500, 2018 WL 377364, at *8 n.8 & *12 n.10 (S.D.N.Y. Jan. 11, 2018) (same).

20 C.F.R. § 404.1527(d)(2); see also Halloran, 362 F.3d at 32.  If the ALJ does not afford a treating physician's opinion controlling weight, he or she must "comprehensively set forth reasons for the weight assigned" to that opinion.  Halloran, 362 F.3d at 33.

First, the ALJ was not required to state the weight he accorded to each and every medical report included in the record, especially when the medical records span 45 years of plaintiff's life.  Although an ALJ is generally obligated to explain his reasons for affording the weight he gives a treating physician's opinions, see 20 C.F.R. § 404.1527(d)(2), failure to specifically state the weight accorded to such opinions does not necessarily require remand to the Commissioner.  If the ALJ "engaged in a detailed discussion of [the treating physician's] findings, and his decision does not conflict with them," such a failure constitutes only "harmless error, and does not provide a basis for a remand."  Jones v. Barnhart, 02-CV-0791, 2003 WL 941722, at *10 (S.D.N.Y. Mar. 7, 2003); see Carway v. Astrue, 06-CV-13090, 2010 WL 6121686, at *11 (S.D.N.Y. Aug. 17, 2010) (report and recommendation) (same), adopted by, 06-CV-13090, 2011 WL 924215 (S.D.N.Y. Mar. 16, 2011).

In this case, the ALJ clearly reviewed and considered the opinions of Dr. Entin, a treating physician, as well as the opinions of Drs. Elliot and Appenzeller—the ALJ explicitly recited the relevant findings of these doctors in his decision.  (See Tr. 19-20.)  Additionally, the ALJ's decision was generally consistent with these opinions, including the opinion of Dr. Entin.[2]  For example, Dr. Entin found a probable diagnosis of cerebral palsy and Dr. Pollack's opinion, which the ALJ credited, included a diagnosis of cerebral palsy.  Moreover, Dr. Entin did not submit an impairment questionnaire or opine on any work-related limitations.  While the ALJ ideally should

---

[2] Plaintiff identifies some instances in which Dr. Entin found greater symptomatology than Dr. Pollack, but fails to identify how Dr. Entin's findings were inconsistent with the ALJ's decision.

have noted what weight he gave to each of these opinions, such error was harmless and does not require remand.  Finally, contrary to the plaintiff's assertion, the opinions of Drs. Entin, Elliot, and Appenzeller do not show that the ALJ's findings were not supported by substantial evidence.

Second, plaintiff's arguments concerning Dr. Zanger are also not persuasive.  Plaintiff contends that the ALJ failed to adequately describe his reasons for finding that Dr. Zanger's opinion was not entitled to great weight.  Plaintiff also maintains that the ALJ erred by failing to credit Dr. Zanger's opinion, asserting, inter alia, that the ALJ should not have credited Dr. Pollack over Dr. Zanger because Dr. Pollack was not a specialist and recommended that plaintiff undergo a cognitive evaluation, "essentially deferring assessment of functionality to clinical psychological evaluation."  (Pl.'s Br. 10.)

The ALJ, however, adequately described his reasons for determining that Dr. Zanger's opinion was not entitled to great weight, and there was substantial evidence in the record justifying that decision, including the testimony concerning plaintiff's work history, the opinions of Drs. Pollack, Miller, and Kennedy-Walsh, and the other evidence in the record.[3]  The ALJ noted that there was contradictory evidence in the record, including testimony from plaintiff and her parents regarding her ability to drive herself to work, to dress herself, to clean and to participate in a bowling league.  (Tr. 21.)  Additionally, plaintiff testified that she was able to process parking permits, shell-fishing licenses and beach passes, which "involves knowing the applicable town rules."  (Id.)  The ALJ did not err in determining that such evidence, coupled with plaintiff's 16-year employment as a data entry clerk, could not be squared with Dr. Zanger's opinion that plaintiff "cannot be expected to do any gainful competitive employment and her limitations

---

[3] Plaintiff never explicitly argues that Dr. Zanger qualifies as a treating physician.  In any evert, even if plaintiff made such an argument, the ALJ adequately described his reasons for not giving great weight to Dr. Zanger's opinion.

interfere with her ability to function independently, appropriately, and effectively on any sustained basis."[4]  (Id. at 508.)

Finally, Dr. Zanger's conclusion that the plaintiff was unable to work was not controlling, as this determination was ultimately the ALJ's to make.  See Guzman, 2011 WL 666194, at *10 ("[A] treating physician's opinion that the claimant is 'disabled' or 'unable to work' is not controlling.") (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)).

Accordingly, the ALJ's decision not to accord Dr. Zanger's opinion great weight was not erroneous.  The ALJ's decision was based on a thorough review of the record and was supported by substantial evidence.

### III.   CONCLUSION

For the foregoing reasons plaintiff's motion for judgment on the pleadings is DENIED and defendant's cross-motion for judgment on the pleadings is GRANTED.  The Clerk of Court is directed to enter judgment in favor of defendant and close the case.

Dated:  March 29, 2018
        Central Islip, New York

                                    _____/s/ (JMA)_____
                                    Joan M. Azrack
                                    United States District Judge

---

[4]  Although not explicitly relied on by the ALJ, the Court notes that Dr. Appenzeller made certain findings that also supported the ALJ's decision, including Dr. Appenzeller's findings that plaintiff had only mild or moderate limitations with respect to her speech and that plaintiff's "speech intelligibility was fair to good, and her articulation skills were within functional limits."  (Tr. 405, 436.)  These findings are in contrast to Dr. Zanger's opinion, which was somewhat conclusory in its findings and did not specifically address how plaintiff's limitations prevented her from being able to engage in any gainful employment.  It is also noted that, in contrast to Dr. Zanger, Dr. Appenzeller, who also conducted a psychological evaluation of plaintiff, concluded that she "has the potential to meet the challenges of an employment setting as long as the job requirements fit her skill set, and potential employers understand her needs and are willing to provide the necessary accommodations."  (Tr. 435.)